UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
ELLIOT SPIEGEL[1] and JONATHAN SCHATZBERG,

                          Plaintiffs,                   **<ins>MEMORANDUM and ORDER</ins>**

        -against-                               03-CV-5088 (SLT) (RLM)


DANIEL "TIGER" SCHULMANN and
UAK MANAGEMENT COMPANY, INC.,

                          Defendants.
-----------------------------------------------------------------------x
**TOWNES, United States District Judge:**

        Plaintiffs Elliot Spiegel and Jonathan Schatzberg, both of whom were formerly employed

at various Tiger Schulmann Karate Centers ("Centers"), bring this action under the Americans

with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), other federal statutes, and various

State and local laws, principally alleging that Spiegel was twice wrongfully terminated on

account of his obesity and that defendants retaliated against both plaintiffs after Spiegel sought

legal remedies for the alleged discrimination. Defendants now move for summary judgment

pursuant to Fed. R. Civ. P. 56, and plaintiffs cross-move for leave to further amend their

pleadings to add a new defendant. For the reasons stated below, defendants' motion for

summary judgment is granted with respect to Counts I, II, III, IV, V, VI and IX of the Second

Amended Complaint ("Second Am. Complt."). This Court declines to exercise supplemental

jurisdiction with respect to Counts VII and VIII, which are, therefore, dismissed without

prejudice. Plaintiffs' cross-motion is denied.

                        [1]Although plaintiffs' pleadings consistently refer to Mr. Spiegel as "Elliot," a sworn
affidavit submitted by Spiegel himself in response to defendants' motion for summary judgment
reveals that his first name is spelled "Eliot." To be consistent with the pleadings, this Court
hereafter refers to Spiegel as "Elliot Spiegel."

<u>BACKGROUND</u>

Defendant Daniel "Tiger" Schulmann is the founder and developer of the "Tiger Schulmann Karate" system of martial arts. Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defendants' Memo") at 2; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Memo") at 1.[2] This system is taught at approximately forty franchised Tiger Schulmann Karate schools or "Centers," including Centers in Bensonhurst, Brooklyn (the "Bensonhurst Center"); Paramus, New Jersey (the "Paramus Center"); Stamford, Connecticut (the "Stamford Center") and Rego Park, Queens (the "Rego Park Center"). *Id.*

Plaintiffs were employed at several of these Centers. Defendants' Rule 56.1 Statement ("Def. 56.1") at ¶ 2; Plaintiffs' Response to Defendants' Rule 56.1 Statement ("Pl. 56.1") at p. 2. Both plaintiffs were ultimately fired, giving rise to the instant action. Defendants – who allege that plaintiffs were employed by franchisees and not by them, Def. 56.1 at ¶ 2 – do not provide the dates on which plaintiffs were hired or fired. However, the relevant dates can be ascertained by scrutinizing and comparing the exhibits offered by the parties.[3]

_____

[2]Defendants' Memo is not paginated. However, its "Table of Contents" indicates that defendants meant to designate the page on which the "Preliminary Statement" appears as page 1. The Court has therefore numbered the pages sequentially beginning with that page.

[3]This task could have been rendered much easier if defendants had provided an adequate Rule 56.1 Statement. Such statements are to provide a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried." *See* Local Civil Rule 56.1(a). In addition, each statement of material fact is to be "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civil Rule 56.1(d).

As originally filed, defendants' 56.1 statement alleged very few uncontested material facts and failed to cite the evidence with adequate specificity. In September 2006, this Court's

Although defendants have denied knowledge or information sufficient to form a belief as to the truth of plaintiffs' allegation that Spiegel was first hired in April 1999, *see* Second Am. Complt. at ¶ 9; Answer to Second Am. Complt. at ¶ 2, defendants represent that plaintiff executed an Employee Model Release on July 18, 2000. *See* Defendants' Memo, Ex. M. That release, in which Spiegel agreed to be photographed and to have his photographs used in promotional materials, expressly states that Spiegel's agreement is "in consideration of [Spiegel's] employment and/or continued employment with an entity and/or entities that operate Tiger Schulmann's Karate Centers." *Id.* Therefore, while defendants may not agree concerning the exact duration of Spiegel's employment, defendants implicitly agree that Spiegel was employed at one of the Centers as early as July 2000.

Defendants also deny knowledge or information sufficient to form a belief as to the truth of plaintiffs' detailed allegations concerning Spiegel's employment at various Centers between July 2000 and August 2001. *See* Second Am. Complt. at ¶¶ 14-20; Answer to Second Am. Complt. at ¶ 2. However, according to documents attached to and relied upon in Defendants'

_____

(Fn. 2, cont'd)
case manager advised defendants' Connecticut-based counsel of Rule 56.1's requirements and directed him to re-file the statement. Although the amended statement contains adequate cites, it still alleges very few uncontested facts. Rather, defendants' 56.1 statement primarily sets forth the defendants' position with respect to contested issues.

Failure to submit a Rule 56.1 statement "may constitute grounds for the denial of the motion." Local Civil Rule 56.1(a). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules" and may "opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotations omitted). Since the exhibits are not particularly voluminous and since defendants' counsel is located in Connecticut, this Court will exercise its discretion to decide this motion on the merits. However, defendants' counsel is admonished to review the Rule 56.1 requirements and to strictly adhere to them in making any future motions for summary judgment before this Court.

Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Defendants' Reply Memo"), Spiegel was working for the Bensonhurst Center (Bensonhurst Karate, Inc.) in mid-August 2001, when he was fired by the Center's manager, Vincent Gravina. *See* Defendants' Reply Memo, Ex. B., at 17. As will be discussed in greater detail below, the parties disagree as to why Gravina fired Spiegel: defendants claim that Spiegel was fired because he did not get along with his co-workers, while Spiegel maintains that he was fired because he was overweight. However, the parties agree that Spiegel was almost immediately rehired by the Stamford Center (Stamford Karate, Inc.). Spiegel himself testified at his deposition that there was no gap between the time he ceased working at the Bensonhurst Center and the time he started working at the Stamford Center. *See* Deposition of Elliot Spiegel (Ex. B to the Declaration of Eric J. Grannis in Opposition to Defendants' Motion for Summary Judgment ("Grannis Declaration")) at 17, 21. Spiegel's testimony is corroborated by payroll records which indicate that Spiegel was hired by Stamford Karate, Inc., on September 4, 2001. Defendants' Memo, Ex. D.

According to those same payroll records, Spiegel worked in Stamford until June 2002. *Id.* In December 2001, while attending a Challenge of Champions tournament, Spiegel discovered that an altered photograph of his torso was being used in an unflattering manner in advertisements for defendants' "Evolve" nutrition program. *See* Affidavit of Elliot Spiegel, dated Oct. 7, 2005 ("Spiegel Aff.") (Ex. P to the Grannis Declaration) at ¶ 2. Defendants admit that the overweight torso depicted in the advertising is Spiegel's, but note that the photograph did not show Spiegel's head or face or anything else which would permit it to be identified as a picture of Spiegel. *See* Defendants' Memo at 10. Spiegel, however, states that some of his colleagues, including Schatzberg and Gravina, recognized his torso and "mocked" him. Spiegel Aff. at ¶ 2.

On June 2, 2002, plaintiff was fired from the Stamford Center. Defendants' Memo, Ex. D, Ex. N at ¶ 7. Schulmann admitted at his deposition that he, who owned a controlling interest in Stamford Karate, Inc., ordered Gregory Hunko, who ran the Stamford Center, to fire Spiegel. Deposition of Daniel Schulman dated Jan. 5, 2005 (Ex. C to the Defendants' Memo and Ex. H to the Grannis Declaration) at 28. However, the parties disagree as to why Schulmann fired Spiegel. Spiegel claims that he was fired because of his weight, while Schulmann asserts that he fired Spiegel after employees at the Paramus Center told him that Spiegel said he had "no respect" for Schulmann.

At the time of Spiegel's termination, Spiegel's good friend, Schatzberg, was also working at the Stamford Center. Although defendants have denied knowledge or information sufficient to form a belief as to the truth of the allegation, the Second Amended Complaint alleges that Schatzberg decided to quit working at the Stamford Center sometime after Spiegel was fired. Second Am. Complt. at ¶ 40; Answer to Second Am. Complt. at ¶ 2. The Second Amended Complaint further alleges, and payroll records attached to Defendants' Memo confirm, that in early November 2002 Schatzberg was hired by Vincent Gravina to work at the Rego Park Center (Rego Park Karate, Inc.). *See* Second Am. Complt. at ¶ 41; Defendants' Memo, Ex. E.

On November 25, 2002, Spiegel filed charges with the Connecticut Commission on Human Rights and Opportunities. *See* Grannis Declaration, Ex. A. Two or three days later, Gravina fired Schatzberg. *See* Defendants' Memo, Ex. E; Affidavit of Penelope Kousis dated Oct. 21, 2005 (Ex. E to Defendants' Reply Memo) at ¶ 2. The parties do not agree as to why Schatzberg was fired. Plaintiffs allege that defendants, aware of the close relationship between Spiegel and Schatzberg, fired Schatzberg to retaliate against Spiegel for filing charges with the

Connecticut Commission on Human Rights and Opportunities. Defendants assert that Schatzberg was fired for various reasons relating to the quality of his work.

<u>The Plaintiff's Complaints in the Instant Action</u>

On October 8, 2003, plaintiffs commenced the instant action against Schulmann and a New Jersey Corporation – variously named as UAK Management Company, Inc., and UAK Management, Inc. ("UAK") – which allegedly was owned solely by Schulmann and operated the Centers. Complaint at ¶¶ 6-7. Although the original complaint alleged that all parties were citizens of New Jersey, plaintiffs nonetheless chose to file the action in this Court. Moreover, for reasons which are not altogether clear, plaintiffs elected to bring this action solely against Schulmann and UAK. They did not name, and have never sought to add, Bensonhurst Karate, Inc., Stamford Karate, Inc., or Rego Park Karate, Inc., as defendants.

The original complaint asserted five causes of action against these defendants: (1) an ADA claim arising from Spiegel's June 2002 termination from the Stamford Center: (2) a claim pursuant to the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), relating to Spiegel's August 2001 termination from the Bensonhurst Center; (3) a claim pursuant to the New York City Human Rights Law, N.Y. City Admin. Code § 8-107 *et seq.* ("NYCHRL"), also relating to the Spiegel's Bensonhurst termination; (4) a cause of action alleging that defendants' use of Spiegel's photograph violated unspecified New York State defamation and privacy laws; and (5) a cause of action alleging that defendants had intentionally inflicted emotional distress upon Siegel. In addition, the complaint alleged that Schulmann used UAK as his "alter ego," and that Schulmann should, therefore, be liable for the debts of UAK. Complaint at ¶¶ 75-79.

Defendants subsequently moved to dismiss this complaint on various grounds. Judge Allyne R. Ross (who was previously assigned to this case) granted the motion only to the extent of (1) dismissing with prejudice the claim for intentional infliction of emotional distress and (2) dismissing without prejudice all claims against Schulmann on the ground that the complaint failed to allege facts sufficient to make out personal jurisdiction over him. *See Spiegel v. Schulmann*, No. 03 CV 5088 (ARR), slip op. at 27-28 (E.D.N.Y. June 16, 2004). Judge Ross granted plaintiffs leave to amend the complaint "with regard to the plaintiffs' claims against Schulmann" and with regard to the allegations of alter ego liability. *Id.* Judge Ross denied defendants' motion to the extent that it sought to dismiss plaintiffs' first four claims as against UAK. *Id.* at 27.

In July 2004, plaintiffs amended their complaint to add jurisdictional allegations concerning Schulmann. Specifically, plaintiffs added allegations that Schulmann owns "at least 51 percent" of each Center and, "as the sole shareholder, president and director of UAK, derives substantial revenue from services rendered in New York." Amended Complaint ("Am. Complt.") at ¶ 7. Plaintiffs also added an allegation that Gravina "told Spiegel that he was being terminated at the insistence of Schulmann who said to Gravina, 'I own 51 percent of the school and what I say goes.'" *Id.* at ¶ 24. The Amended Complaint did not specifically allege "alter ego" liability and did not add any new causes of action, but clarified that the ADA claims in Count I and the defamation and privacy law claims in Count IV were being asserted solely against UAK. Am. Complt. at 13.

In August 2004, Stamford Karate, Inc., filed suit against Spiegel in Connecticut Superior Court, alleging that, during the first five months of 2002, Spiegel had "continuously solicited"

Hunko – Stamford Karate's Head Instructor – to breach his contractual obligations and to start a new karate school with Spiegel.  *See* Defendants' Memo, Ex. N at ¶¶ 9-12.  Stamford Karate claimed that Spiegel, an employee, had breached his fiduciary duty of loyalty and that his actions both constituted tortious interference with contract and violated the Connecticut Unfair Practices Act.

In November 2004, plaintiffs filed a Second Amended Complaint, principally adding retaliation claims relating both to the Connecticut state action and to UAK's alleged failure to pay Spiegel's medical claims.  In that complaint, Spiegel alleges that following his termination from the Stamford Center, he elected to continue his health coverage with UAK as permitted under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), and the Consolidated Omnibus Budget Reconciliation Act of 1986, 29 U.S.C. §§ 1161 *et seq.* ("COBRA").  Second Am. Complt. at ¶¶ 86-87.  Plaintiffs allege, upon information and belief, that UAK is self-insured with respect to "some claims," and assert that "UAK has refused to pay Spiegel's qualifying medical expenses."  *Id.* at ¶¶ 85, 90.  The Second Amended Complaint does not identify the claims UAK allegedly failed to pay or the dates on which such claims were rejected, and does not specify the types of claims for which UAK is "self-insured."

The Second Amended Complaint raises five new causes of action (Counts V through IX), four of which allege retaliation.[4]  Counts V and VI both allege that defendants retaliated against Spiegel in violation of Title IV of the ADA, 42 U.S.C. § 12203; Count V alleges that the Connecticut action constituted such retaliation, and Count VI alleges that defendants retaliated

_____

[4]Plaintiffs' ninth cause of action is erroneously designated in the Second Amended Complaint as a second "Count IV."  To avoid confusion, this cause of action is hereafter referred to as "Count IX."

against Spiegel by refusing to pay his medical claims. Count VII alleges that defendants have retaliated against plaintiffs in violation of the NYSHRL by (1) filing a frivolous lawsuit against Spiegel, (2) withholding Spiegel's medical benefits and (3) terminating Schatzberg "because of his anticipated testimony and assistance in Spiegel's claim under New York Executive Law § 296 and because of his opposition to practices forbidden by that statute." *Id.* at ¶¶ 97-98. Count VIII alleges that defendants have retaliated against plaintiffs in violation of the NYCHRL by (1) filing a frivolous lawsuit against Spiegel, (2) withholding Spiegel's medical benefits and (3) terminating Schatzberg "because of his anticipated testimony and assistance in Spiegel's claim under New York City Administrative Code § 8-107 and because of his opposition to practices forbidden by that chapter." *Id.* at ¶¶ 101-02. Count IX seeks to enforce Spiegel's rights under ERISA and COBRA by "enjoin[ing] UAK to honor the terms of Spiegel's continuing coverage and to pay his eligible medical expenses." *Id.* at ¶ 107.

The Motions at Issue

Defendants now move for summary judgment with respect to each and every count of the Second Amended Complaint. Defendants preliminarily argue that all causes of action should be dismissed because this Court lacks personal jurisdiction over both defendants and because neither defendant ever employed plaintiffs. Defendants then raise arguments specific to the various causes of action, which are described in detail in the discussion below. Plaintiffs cross-move pursuant to Fed. R. Civ. P. 15(a) and 20 to further amend their pleadings in order to add a new defendant, TSK Franchise Systems, Inc. ("TSK").

The Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)*; Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the non-movant cannot rely on hearsay testimony which would not be admissible if testified to at trial. *See*, *e.g.*, *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); Fed. R. Civ. P. 56(e).

Personal Jurisdiction

Defendants' first argument in their motion for summary judgment asserts, *inter alia*, that this action must be dismissed because defendants "are not subject to personal jurisdiction within the State of New York." Defendants' Memo at 6. Noting that Judge Ross dismissed without prejudice the claims against defendant Schulmann on the ground that the original complaint did not allege facts which, if true, would establish personal jurisdiction over him, defendants first argue that plaintiffs' Amended Complaint failed to cure this defect. *Id.* at 6-7. Next, citing to a portion of Schulmann's deposition in which he states that he never travels to New York City "for business" and an affidavit in which the Chief Financial Officer of UAK denies that the

corporation has ever transacted business in New York, defendants argue that they do not have "sufficient New York contacts . . . to subject them to jurisdiction in this state." *Id.* at 6 (citing Ex. C and Ex. Q). Finally, defendants argue that "[p]laintiffs have not . . . alleged a sufficient nexus between the defendants, the causes of action asserted, and the State of New York . . . ." *Id.* at 7.

"A two-pronged test decides the question of personal jurisdiction: 1) 'whether there is jurisdiction over the defendant under the relevant forum state's laws'; and 2) 'whether an exercise of jurisdiction under these laws is consistent with federal due process requirements.'" *Time, Inc. v. Simpson*, No. 02 Civ. 4917 (MBM), 2003 WL 23018890, at *1 (S.D.N.Y. Dec. 22, 2003) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). Plaintiffs bear the burden of establishing personal jurisdiction over the defendant. *See, e.g.*, *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993). The showing needed to meet that burden varies depending on the stage of the litigation. Prior to trial or an evidentiary hearing on the issue of personal jurisdiction, a plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). However, when no evidentiary hearing has been held "but the parties have conducted extensive discovery into the . . . defendants contacts with the forum state, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999) (internal quotations and citations omitted; bracketed material, but not elipses, in original). These averments must be construed in the light most favorable to plaintiffs and all doubts must be

resolved in plaintiffs' favor.  *See*, *e.g.*, *Landoil Res. Corp. v. Alexander & Alexander Services, Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1991).

This Court has Personal Jurisdiction over Schulmann

When Judge Ross addressed defendants' motion to dismiss – approximately eight months after the action had been filed and prior to the initial conference before Magistrate Judge Mann – there was nothing to suggest that substantial discovery had taken place.  Accordingly, Judge Ross applied the least exacting standard, reviewing the allegations in the complaint to determine if they made out a *prima facie* showing of jurisdiction.  *See Spiegel*, slip op. at 13.  Judge Ross held that the allegations in the original complaint were insufficient to make such a showing with respect to Schulmann.  *Id.* at 20.  However, noting that plaintiffs' memorandum of law in opposition to the motion to dismiss suggested that plaintiffs were "in a position to make a much stronger case for jurisdiction over Schulmann," *id.*, Judge Ross dismissed the claims against Schulmann without prejudice, and granted plaintiffs leave to amend their complaint in an effort to make a sufficient showing of personal jurisdiction.  *Id.* at 28.

Contrary to defendants' assertions, plaintiffs have cured the deficiencies in their original pleading.  In their Amended Complaint, filed in July 2004, plaintiffs allege that Schulmann owns "at least 51 percent" of each Center.  Am. Complt. at ¶ 7.  In addition, plaintiffs allege that, in firing Spiegel from the Bensonhurst Center, Gravina "told Spiegel that he was being terminated at the insistence of Schulmann who said to Gravina, 'I own 51 percent of the school and what I say goes.'"  *Id.* at ¶ 24.

These allegations are sufficient to establish personal jurisdiction over Schulmann.  Although plaintiffs do not expressly allege that Schulmann himself does business in New York, there is no question that the entities which fired plaintiffs – Bensonhurst Karate, Inc. and Rego

Park Karate, Inc. – are domestic corporations.[5]  Moreover, the allegations in the Amended Complaint at least imply that Schulmann ordered the terminations in his capacity as a principal of those corporations.

"Under New York law 'individual corporate officers may be subject to jurisdiction in New York if it is established that the corporation is acting as their agent here.'" *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 253 (S.D.N.Y. 2003) (quoting *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 984 (S.D.N.Y. 1992)).  While plaintiffs cannot establish jurisdiction simply by establishing that Schulmann is an officer in a New York corporation, they may do so by establishing "that the corporation acted 'with the knowledge and consent of the officer and the officer . . . exercised control over the corporation in the transaction.'" *Id*.  The Amended Complaint explicitly alleges that Schulmann, as owner of 51 percent of the corporation, used his control over the corporation to effect the firing of Spiegel.  Accordingly, the allegations in the Amended Complaint are sufficient to establish personal jurisdiction over Schulmann under N.Y.C.P.L.R. § 301.

The allegations are also sufficient to establish personal jurisdiction over Schulmann under N.Y.C.P.L.R. § 302(a)(1).  Section 302(a)(1) provides that a court may exercise personal jurisdiction "over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," but only with respect to any cause of action arising from that transaction of business.  This provision "extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [himself] of the privilege of conducting activities within New York.'" *Bank Brussels Lambert*, 171 F.3d at 787 (quoting *Parke-Bernet Galleries, Inc. v.*

---

[5]This Court will take judicial notice that Bensonhurst Karate, Inc., and Rego Park Karate, Inc., are both domestic business corporations, and that documents filed with the Department of State name Schulmann as the Chief Executive Officer.  *See* www.dos.state.ny.us.

*Franklyn*, 26 N.Y.2d 13, 18, 308 N.Y.S. 337, 341 (1970)) (bracketed material in *Bank Brussels Lambert*). A single transaction is sufficient to fulfill this requirement, provided that "the relevant cause of action also arises from that transaction." *Id.*

The determination of whether a party has "transacted business" in New York is based on "the totality of circumstances concerning the party's interactions with, and activities within, the state." *Id.* On similar facts, another court has performed this fact-specific analysis and determined that Schulmann is transacting business in New York. In *Mehrkar v. Schulmann*, No. 99 Civ. 10974 (DC), 2001 WL 79901 (S.D.N.Y. Jan. 30, 2001), a former minority shareholder and employee of Yonkers Karate, Inc. – the Center operating in Yonkers, New York – brought an action against Schulmann, alleging the breach of a stock agreement entered into by the parties. Although Judge Chin granted the defendants' motion to dismiss, he held that the allegations in the complaint in that case established personal jurisdiction against Schulmann, stating:

> Schulmann was a 51% shareholder of Yonkers Karate, a New York corporation . . .; he received 50% of Yonkers Karate's profits; he owns or operates at least 16 karate centers in New York; he is the president, director, and sole shareholder of UAK, which provided services to Yonkers Karate and received revenue from Yonkers Karate; and . . . Schulmann signed the Stock Agreement with plaintiff, as the "President" of Yonkers Karate, Inc.

*Mehrkar*, 2001 WL 79901, at *3. Judge Chin further held that the causes of action in that case "arose out of these activities." *Id.* at *4.

In this case, the Amended Complaint and the Second Amended Complaint both allege that Schulmann "owns at least 51 percent of each Tiger Schulmann Karate School" and that, "as the sole shareholder, president and director of UAK," Schulmann "derives substantial revenue from services rendered in New York." Am. Complt. at ¶ 7; Second Am. Complt. at ¶ 7.

14

Although neither complaint alleges the number of New York Centers, the pleadings specifically name two Centers in New York: Bensonhurst and Rego Park. Neither complaint alleges what percentage of the profit from these Centers flows to Schulmann or what position Schulmann holds in these New York corporations, but both imply that Schulmann receives some portion of these profits and controls the corporations.

Accordingly, under the totality of the circumstances, the facts alleged in the Amended and Second Amended Complaints in this case, like the allegations in the *Mekhkar* complaint, are sufficient to establish that Schulmann is transacting business in New York. The claims alleged in this case arise from that business. Therefore, this Court concludes that the allegations of the pleadings are sufficient to establish that there is personal jurisdiction over Schulmann under both N.Y.C.P.L.R. § 301 and § 302(a)(1). In addition, the pleadings allege that Schulmann has sufficient "minimum contacts" with New York to satisfy the due process prong.

To make a *prima facie* showing of personal jurisdiction at this juncture, however, plaintiffs cannot merely rely on the allegations in their pleadings. Because the instant motion for summary judgment was made following the close of discovery in this case and long after defendants raised the personal jurisdiction issue in their motion to dismiss, this Court presumes that the parties have conducted extensive discovery into defendants' contacts with New York. Therefore, plaintiffs "must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Kernan*, 175 F.3d at 240.

The facts averred by plaintiffs provide a less solid basis for asserting personal jurisdiction over Schulmann than do the facts alleged in the amended complaints. Nonetheless, the averred facts, if credited by the trier of fact, would be sufficient to establish personal jurisdiction. Plaintiffs' Memo states that Schulmann "holds at least a 50% equity interest" in every Center

and "majority or sole voting rights" in the corporations controlling those Centers. Plaintiffs'

Memo at 13. These averments are substantiated by portions of Schulmann's deposition

testimony (Ex. H to the Grannis Declaration) in which Schulmann testified that he had a

"controlling interest" in both Bensonhurst Karate, Inc., and Rego Park Karate, Inc., *id.* at 14-15,

and by portions of the deposition testimony of Gregory Hunko – part owner of the Stamford

Center – in which Hunko testified that Schulmann realized 50% of the profits generated by the

Centers. *See* Grannis Declaration, Ex. C at 12. In addition, Plaintiffs' Memo avers that

Schulmann used his controlling interest in the Stamford Center to fire Spiegel – an averment

which is amply substantiated by the deposition testimony of both Schulmann and Hunko. *See*

Grannis Declaration, Ex. C. at 30. Although plaintiffs do not aver facts to support the claim, set

forth in their pleadings, that Schulmann similarly ordered that Spiegel be fired from the

Bensonhurst Center, Spiegel's deposition testimony concerning the circumstances of his firing –

including the fact that it immediately followed a meeting between Gravina and Schulmann –

provides circumstantial evidence that Schulmann may also have ordered the Bensonhurst

termination. Construed in the light most favorable to plaintiffs, *see Landoil Res. Corp.*, 918 F.2d

at 1043, these averments make out the *prima facie* showing necessary to defeat defendants'

motion to dismiss all claims against Schulmann for lack of personal jurisdiction.

This Court Lacks Personal Jurisdiction over UAK

On the other hand, the averments in Plaintiffs' Memo and the exhibits attached thereto

are insufficient to substantiate the allegation – contained in all three of plaintiffs' complaints –

that UAK "does business within New York." Second Am. Complt. at ¶ 6; Am. Complt. at ¶ 6;

Complt. at ¶ 6. Under longstanding New York caselaw – expressly retained as a basis for

personal jurisdiction under N.Y.C.P.L.R. § 301 – "[a] corporation is 'doing business' and is

therefore 'present' in New York and subject to personal jurisdiction . . . if it does business in New York 'not occasionally or casually, but with a fair measure of permanence and continuity." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985) (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)). A plaintiff seeking to establish personal jurisdiction under a "doing business" theory "must show that a defendant engaged in 'continuous, permanent, and substantial activity in New York.'" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d Cir. 2000), *cert. denied*, 532 U.S. 941 (2001) (quoting *Landoil Res. Corp.*, 918 F.2d at 1043).

The test for determining whether to find jurisdiction under this theory "is a simple pragmatic one, . . . which is necessarily fact sensitive because each case is dependent upon its own particular circumstances." *Landoil Res. Corp.*, 918 F.2d at 1043 (internal citations and quotations omitted). In making this determination, federal and state courts alike have "focused on a traditional set of indicia: for example, whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." *Wiwa*, 226 F.3d at 98 (citing *Hoffritz for Cutlery*, 763 F.2d at 58, and *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44 (1967)). However, because a finding that a corporation is "doing business" subjects that corporation to personal jurisdiction "with respect to any cause of action, related or unrelated to the New York contacts," *Hoffritz for Cutlery*, 763 F.2d at 58, "the 'doing business' standard has, for practical reasons, been applied stringently." *Yanouskiy v. Eldorado Logistics Sys., Inc.*, No. 05-CV-2202 (ENV), 2006 WL 3050871, at *2 (E.D.N.Y. Oct. 20, 2006) (citing *Jacobs v. Felix*

*Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001)).

In this case, plaintiffs have not averred facts that would suffice to establish any of the traditional indicia of doing business in New York. There is nothing in plaintiffs' papers or in any of the exhibits attached to the motion papers submitted by the parties to suggest that UAK has an office, bank accounts or any other property in New York. Although there is evidence that UAK may assist the Centers with advertising, *see*, *e.g.*, Deposition of Gregory Hunko (Ex. C to the Grannis Declaration) at 8, there is nothing to suggest that UAK is engaged in any public relations work on its own behalf. Finally, there is nothing to suggest that UAK itself has any employees permanently located in New York State to promote its interests. Accordingly, plaintiffs have not made a *prima facie* showing that UAK is doing business in New York. *See Kernan*, 175 F.3d at 240.

To be sure, plaintiffs have averred facts tending to show that UAK is transacting business in New York. Plaintiffs allege that "UAK controls most of the [Centers'] day-to-day operations including accounts payable, accounts receivable, bookkeeping, payroll, marketing, legal services, training, employee health insurance, and the like." Plaintiffs' Memo at 13. These allegations are substantiated to some extent by evidence introduced by plaintiffs. For example, Gregory Hunko of the Stamford Center testified at his deposition that UAK provided "[e]verything from bookkeeping services to payroll to certain legal services to advertising management, [and] general training." Grannis Declaration, Ex. C at 8. Similarly, John Evensen testified that in 2001, UAK provided the Bensonhurst Center with accounting, advertising and payroll services. Deposition of John Evensen dated Jan. 5, 2005 (Ex. F to the Grannis Declaration) at 11. Moreover, UAK's Chief Financial Officer, Michael Sachs, testified at his

deposition that UAK handled the Centers' "accounts payable" by "help[ing] cut the checks" and by "pay[ing] their vendors through their accounts"; assisted "in the payment of marketing our materials" and "advertising"; and updated the Centers' software and did some "graphic design work . . . for them."  Deposition of Michael Sachs dated Jan. 27, 2005 (Ex. I to the Grannis Declaration) at 9-10.

This proof of UAK's provision of these sorts of "legal, marketing, accounting and advertising services" is sufficient to demonstrate that UAK "availed itself of the privilege of conducting activities in New York."  *See Mehrkar*, 2001 WL 79901, at *4.  However, as previously noted,  a New York court may exercise personal jurisdiction over a non-domiciliary under N.Y.C.P.L.R. § 302(a)(1) only "[a]s to a cause of action arising from" that transaction of business.  In this case, however, there is nothing to suggest that any of plaintiffs' claims arise from UAK's provision of these services.  Although UAK may have processed the Centers' payrolls and prepared paychecks, there is no evidence that UAK ever controlled the Centers or made any staffing decision for them.  Indeed, Hunko testified that he himself signed the payroll checks, Deposition of Gregory Hunko (Ex. C to the Grannis Declaration) at 11, implying that he, as manager of the Stamford Center, was responsible for his own employees.  While Hunko had to consult Schulmann in order to hire Spiegel, and was subsequently ordered by Schulmann to fire Spiegel, there is nothing to suggest that Schulmann was acting on behalf of UAK, rather than in his capacity as majority shareholder of Stamford Karate, Inc.  Therefore, plaintiffs have not averred facts sufficient to establish personal jurisdiction over UAK under a "transacting business" theory.  All claims against UAK are, therefore, dismissed for lack of personal jurisdiction.

<u>Count I</u>

Even if this Court had personal jurisdiction over UAK, it would nonetheless dismiss that

portion of Count I which alleges that UAK violated Title I of the ADA by causing Spiegel to be

discharged from the Stamford Center.  In analyzing an ADA case, one applies the same burden-

shifting analysis originally established by the Supreme Court in a Title VII case, *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Heyman v. Oueens Village Comm.*

*for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999);

*see also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (applying *McDonnell*

*Douglas* analysis to an ADA claim).  Under the *McDonnell Douglas* burden-shifting framework:

> [P]laintiff bears the initial burden of proving by a preponderance
> of the evidence a prima facie case of discrimination.  . . .  The
> burden of production then shifts to defendants, who must offer
> through the introduction of admissible evidence a non-
> discriminatory reason for their actions that, if believed by the trier
> of fact, would support a finding that unlawful discrimination was
> not a cause of the disputed employment action.  Plaintiff then must
> show that the proferred reason was merely a pretext for
> discrimination, which may be demonstrated either by the
> presentation of additional evidence showing that the employer's
> proffered explanation is unworthy of credence, or by reliance on
> the evidence comprising the prima facie case, without more.

*Heyman*, 198 F.3d at 72 (internal quotations and citations omitted) (citing *Chambers v. TRM*

*Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994)).

Although the evidence necessary to establish plaintiff's initial burden has been

characterized by the Second Circuit as "minimal" and "de minimis," *see Zimmerman v.*

*Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citing cases), "it is not non-

existent."  *Almond v. Westchester County Dep't of Corrections*, 425 F. Supp. 2d 394, 399

(S.D.N.Y. 2006).  "[S]ummary judgment must be granted whenever the undisputed facts, viewed

most favorably to the non-moving plaintiff, do not make out a *prima facie* case." *Id.* In

addition, summary judgment is appropriate where the only evidence offered to prove the *prima facie* case is conclusory and insufficiently particular to permit a defendant to respond, since "[t]o

allow a party to defeat a motion for summary judgment by offering purely conclusory allegations

of discrimination, absent any concrete particulars, would necessitate a trial in all . . . cases."

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985).

In order to make out a *prima facie* case under the ADA, a plaintiff must establish (1) that

the plaintiff's employer is subject to the ADA; (2) that the plaintiff was disabled within the

meaning of the ADA; (3) that the plaintiff was otherwise qualified to perform the essential

functions of his or her job, with or without reasonable accommodation; and (4) that the plaintiff

suffered an adverse employment action because of his or her disability. *See*, *e.g.*, *Jacques v.*

*DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Cmty. Aid for Retarded*

*Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003)). Defendants argue, *inter alia*, that Spiegel cannot

establish the second of these elements because he is not "disabled" as that term is defined by the

ADA. This Court agrees.

The ADA defines the term "disability" to mean: "(A) a physical or mental impairment

that substantially limits one or more of the major life activities of such individual; (B) a record of

such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.

§12102(2). Many of the terms used in this definition are further defined in regulations

promulgated by the Equal Employment Opportunity Commission ("EEOC"). For example, these

regulations define a "physical impairment" as "[a]ny physiological disorder . . . affecting one or

more of the following body systems: neurological, musculoskeletal, special sense organs,

respiratory . . . , cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.2(h)(1). These same regulations also define the term "substantially limits" to mean "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignficantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). In addition, the regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

Obesity alone is not a physical impairment unless it results from a physiological disorder of the sort described in 29 C.F.R. § 1630.2(h)(1). *See Francis v. City of Meriden*, 129 F.3d 281, 286 (2d Cir. 1997). Plaintiffs have introduced evidence, in the form of a two-sentence letter from Spiegel's doctor, that Spiegel suffers from "hypogonadism," and has low testosterone levels as a result. *See* Letter of Ian H. Levy, DO, dated Jan. 12, 2005 (Ex. N to the Grannis Declaration). However, Dr. Levy's letter does not state that this condition is related to Spiegel's weight problem, and plaintiffs have not produced any admissible evidence to that effect.[6]

Even assuming that Spiegel's obesity is a physical impairment, there is nothing in Dr.

---

[6]Although Plaintiffs' Memo alleges that "Spiegel's obesity is due to . . . hypogonadism," *id.* at 11, the memorandum does not cite any authority for this proposition. It is possible that this proposition could find some support in testimony from Spiegel himself; Plaintiffs' Memo suggests that page 76 of the Spiegel deposition contains a discussion of his condition. However, this page is not included in the exhibits attached to the Grannis Declaration. Moreover, even assuming, *arguendo*, that Spiegel testified that his doctors informed him that his obesity was related to hypogonadism, such testimony would be hearsay and inadmissible at trial.

Levy's letter or elsewhere in the motion papers to suggest that it renders Spiegel unable to perform a major life activity or significantly restricts the condition, manner or duration in which he can perform a major life activity. Dr. Levy's letter states that the "low Testosterone levels" resulting from plaintiffs' hypogonadism are being treated with AndroGel.[7] Plaintiffs do not contend that Spiegel's condition or weight interfere with his ability to perform his work. Indeed, according to Spiegel's own deposition testimony, his doctor said he was as "healthy as a horse." Deposition of Elliot Spiegel (Ex. J to Defendants' Memo) at 77. Therefore, Spiegel does not meet the definition of "disability" set forth in 42 U.S.C. § 12102(2)(A).

Plaintiffs implicitly concede this point, arguing instead that Spiegel is disabled under 42 U.S.C. § 12102(2)(C) "because his condition was regarded as a disability." Plaintiffs' Memo at 11. An individual need not have a physical impairment to state a claim under subsection (C), as long as the individual is "regarded as having such an impairment." *Francis*, 129 F.3d at 284. However, "[a] plaintiff cannot state a claim under the 'regarded as' prong of the ADA . . . simply by alleging that the employer believes some physical condition, such as . . . weight . . ., renders the plaintiff disabled." *Id.* at 285. Rather, the plaintiff must allege (and ultimately establish) that the employer "believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Id.* "Thus, while a cause of action may lie against an employer who discriminates against an employee on the basis of the perception that the employee is morbidly obese, . . . or suffers from a weight condition that is the symptom of a

---

[7]This Court will take judicial notice that AndroGel is a brand name for testosterone. *See* www.rxlist.com.

physiological disorder . . . , no cause of action lies against an employer who simply disciplines an employee for not meeting certain weight guidelines."  *Id.* at 286 (internal citations omitted).

Accordingly, plaintiffs must allege and prove more than just that Spiegel was discharged because of his weight.  Plaintiffs must allege, and adduce evidence to show, that defendants believed, even mistakenly, that Spiegel had a "physical impairment" – that is, that his weight problem stemmed from a physiological disorder – and that defendants fired him because of that belief.  Plaintiffs have not done so.  Plaintiffs do not even allege in their pleadings that defendants believed Spiegel suffered from a physiological disorder.  To the contrary, the Second Amended Complaint implies that Schulmann believed Spiegel's weight problem was due to overindulgence.  According to the Second Amended Complaint:

> Schulmann explained to Spiegel at considerable length his views about overweight people.  Defendant Schulmann told him that the fact that he was fat demonstrated that he had no self-esteem and was a weak person.  As such, Schulmann thought Spiegel could not be a proper role model for others.  It was clear that it was not Schulmann's view that Spiegel was physically unable to teach karate, at least at the beginner level.  Rather, it was simply his view that fat people are essentially undisciplined and weak, and therefore cannot be in a role in which others are supposed to look up to and respect them.

Second Am. Complt. at ¶ 36.

Since there is nothing in the complaint, or in any of the evidence produced by plaintiffs, to suggest that Schulmann (or UAK) believed that Spiegel's weight condition was the symptom of a physiological disorder, plaintiffs have neither alleged nor established that Spiegel is disabled under 42 U.S.C. § 12102(2)(C).   Accordingly, even if this Court had personal jurisdiction over UAK, it would find that plaintiffs' allegations concerning UAK's termination of Spiegel from the Bensonhurst Center failed to state a *prima facie* case of discrimination under the ADA.

<u>Count II</u>

Plaintiffs' second cause of action alleges that both defendants violated the NYSHRL by causing Spiegel to be fired from the Bensonhurst Center. In analyzing discrimination claims under the NYSHRL, New York State courts apply the same *McDonnell Douglas* burden-shifting framework which is applied in analyzing ADA claims. *See North Shore Univ. Hosp. v. Rosa*, 86 N.Y.2d 413, 419-20, 633 N.Y.S.2d 462, 464 (1995). Under this framework, "summary judgment for the defendant is appropriate when the plaintiff either (1) fails to establish a prima facie case, or (2) fails to present evidence contradicting a well-presented legitimate reason, offered by the defendant, for the adverse employment action." *Branson v. Ethan Allen, Inc.*, No. 02 CV 6588 (JG), 2004 WL 2468610, at *3 (E.D.N.Y. Nov. 3, 2004).

The elements for establishing a *prima facie* case of discrimination under the ADA and the NYSHRL are the same. *Mark v. Burke Rehabilitation Hosp.*, No. 94 Civ. 3596 (RLC), 1997 WL 189124, at *2, n. 3 (S.D.N.Y. April 17, 1997). To establish a *prima facie* case of discrimination, a plaintiff must show "(i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). In arguing that plaintiffs have not met their burden of establishing a *prima facie* case, defendants principally argue that Spiegel is not "disabled" and therefore not a member of a protected class.

The NYSHRL defines "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory

diagnostic techniques . . . ."  N.Y. Exec. Law § 292(21).  Although the legislative history of the

NYSHRL indicates that "the statutory definition of disability was intended to be coextensive

with that of the federal disability statutes," *Reeves v. Johnson Controls World Services, Inc*., 140

F.3d 144, 155 (2d Cir. 1998), the New York Court of Appeals "has interpreted the meaning of

'disability' under the NYSHRL to be broader than the meaning of 'disabled' under the ADA."

*Shannon v. New York City Transit Auth.*, 332 F.3d 95, 104 n. 2 (2d Cir. 2003).  Under the

NYSHRL, "weight, in and of itself, does not constitute a disability for discrimination

qualification purposes," but plaintiffs who are "medically incapable of meeting . . . weight

requirements due to some cognizable medical condition" may be disabled.  *Delta Air Lines v.

New York State Div. of Human Right*s, 91 N.Y.2d 65, 73, 666 N.Y.S.2d 1004, 1008 (1997).

Moreover, "a cause of action based on disability discrimination remains viable even if the

employer was not aware of any clinical diagnosis, as long as the condition existed."  *Branson*,

2004 WL 2468610, at *4 (citing *Hazeldine v. Beverage Media, Ltd.*, No. 94 Civ. 3166, 1997 WL

469597, at *10 (S.D.N.Y. Jan. 28, 1997)).

     In this case, plaintiffs have adduced evidence that Spiegel suffers from "hypogonadism,"

and has low testosterone levels as a result.  *See* Letter of Ian H. Levy, DO, dated Jan. 12, 2005

(Ex. N to the Grannis Declaration).  However, as previously noted, Dr. Levy's letter does not

state that this condition is related to Spiegel's weight problem, and plaintiffs have not produced

any admissible evidence to that effect.  Moreover, although Spiegel alleges that he has been

unable to lose weight through exercise and sensible eating alone, Second Am. Complt. at ¶ 30,

there is no evidence that Spiegel is medically incapable of losing weight.  Therefore, this Court

does not find that plaintiffs have met the burden of establishing a *prima facie* case of

discrimination against Spiegel under the NYSHRL.

Even assuming that plaintiffs could establish a *prima facie* case, however, plaintiffs have failed "to present evidence contradicting a well-presented legitimate reason, offered by the defendant, for the adverse employment action." *Branson*, 2004 WL 2468610, at *3. Defendants have introduced evidence that Gravina, not defendants, fired Spiegel from the Bensonhurst Center because of "personality conflicts" between Spiegel and other, more essential employees. *See* Deposition of Vincent Gravina (Ex. H to Defendants' Memo) at 10. Specifically, Gravina testified that John Evensen, "[t]he instructor . . . that was basically running the classes and teaching all the classes," did not "get along at all" with Spiegel. *Id.* Indeed, Gravina testified that he "had to basically calm down the other instructor from sometimes wanting to kill" Spiegel. *Id.* at 11. Gravina's testimony was corroborated by that of Evensen himself, who testified that he had told Gravina, "I can't continue to work with him [Spiegel] anymore, so . . . either I leave or he leaves." Deposition of John Evensen (Ex. L to Defendants' Memo) at 9.

Plaintiffs have not adduced any admissible evidence to contradict this testimony or to show that Gravina's stated reasons for terminating Spiegel are pretextual. At his deposition, Spiegel testified that Gravina said he was firing Spiegel because of his weight and that he had been told to fire him. Deposition of Elliot Spiegel (Ex. B to Grannis Declaration) at 17, 37. However, this testimony was not only hearsay, but insufficient to establish that defendants had ordered the firing. According to Spiegel, Gravina never named the person or persons who had told him to fire Spiegel. *Id.* at 37. Rather, as is evident from the following exchange, Spiegel merely speculated that the person was Schulmann, not Evensen:

> Q. You think the order came down from Schulmann above?

A.  In my opinion, I think that may be it, yes.

*Id.* at 18.  However, that assumption was inconsistent with Spiegel's own testimony that Schulmann "had no problem" employing Spiegel at a time when he weighed 300 pounds, *id.* at 10-11, and that Schulmann allowed Spiegel to be re-hired at Stamford almost immediately after the Bensonhurst termination.  Deposition of Elliot Spiegel (Ex. B to Defendants' Reply Memo) at 22.

Spiegel's hearsay testimony and unsubstantiated speculation is insufficient to establish that Gravina's and Evensen's explanations for Spiegel's termination are pretextual.  Accordingly, defendants' motion for summary judgment with respect to plaintiffs' second cause of action is granted.

Count III

Plaintiffs' third cause of action is almost identical to the second cause of action, except that it alleges that both defendants violated the NYCHRL, rather than the NYSHRL, by causing Spiegel to be fired from the Bensonhurst Center.  Although claims brought under the NYCHRL are generally subject to the same analysis as claims brought under the NYSHRL and the ADA, "there are a few differences between the ADA and the state and city codes."  *Greenberg v. New York City Transit Auth.*, 336 F. Supp. 2d 225, 248 (E.D.N.Y. 2004).  In particular, the NYCHRL's definition of "disability" is "even broader" than that of the NYSHRL, encompassing "any physical, medical, mental or psychological impairment, or a history or record of such impairment."  *Id.* (quoting N.Y. City Admin. Code § 8-102(16)(a)).

Although Spiegel may be disabled under the NYCHRL and may be able to state a *prima facie* case under the Code, Spiegel's NYCHRL claim must nonetheless be dismissed.  Like NYSHRL claims, NYCHRL claims are examined using the *McDonnell Douglas* burden-shifting

analysis. *Id.* As noted in the preceding section, defendants have produced evidence to establish that Spiegel's termination was motivated by a legitimate, nondiscriminatory reason, but plaintiffs have not adduced evidence that Gravina's and Evensen's explanations for Spiegel's termination are pretextual. Therefore, defendants' motion for summary judgment is also granted with respect to plaintiffs' third cause of action.

Count IV

Plaintiffs' fourth cause of action alleges that UAK violated unspecified New York State defamation and privacy laws by using an altered photograph of Spiegel for advertising purposes either without having obtained his permission or without having obtained his permission to use the photograph "in the manner in which it was used." Second Am. Complt. at ¶¶ 70-71. Defendants argue that this cause of action must be dismissed because (1) Spiegel executed a written release granting UAK the right to use his photograph in any manner and (2) Spiegel cannot be identified in the photograph. Defendants' Memo at 9-10. In response, plaintiffs argue that the scope of Spiegel's consent presents a genuine issue of material fact which must be decided by the finder of facts. Plaintiffs' Memo at 21.

Although plaintiffs' pleadings do not specify the statutory basis for the fourth cause of action, both parties agree that this action is brought pursuant to New York Civil Rights Law § 51. *See* Defendants' Memo at 9; Plaintiffs' Memo at 21. That section provides that any person whose "portrait or picture" is used within New York State for advertising purposes without "written consent" may institute an equitable action for injunctive relief and damages. N.Y. Civil Rights Law § 51. Since "[t]he statute is designed to protect a person's identity, not merely a property interest in his or her 'name', 'portrait' or 'picture', . . . it implicitly requires that plaintiff be capable of identification from the objectionable material itself." *Cohen v. Herbal*

*Concepts, Inc.*, 63 N.Y.2d 379, 384, 482 N.Y.S.2d 457, 459 (1984).

It is not necessary that a plaintiff's face be visible in an advertisement for the plaintiff to maintain an action under § 51. *Id.* The statute bars "the improper use of a 'picture' of plaintiff which does not show the face." *Id.* However, if the plaintiff is not recognizable from the picture – such as where the picture depicts only a hand or a foot without identifying features – a § 51 privacy action cannot be sustained. *Id.*

The question of whether a photograph "presents a recognizable likeness is generally a jury question unless plaintiff cannot be identified because of the limited subject matter revealed in the photograph or the quality of the image." *Id.* However, "[b]efore a jury may be permitted to decide the issue, to survive a motion for summary judgment, plaintiff must satisfy the court that the person in the photograph is capable of being identified from the advertisement alone and that [the] plaintiff has been so identified." *Id.* It is unclear whether proof that third parties identified the plaintiff is required to surmount this hurdle; although the New York Court of Appeals does not appear to have directly addressed this issue, the *Cohen* Court noted that evidence that a plaintiff identified himself or herself "may be sufficient." *Id.*, 63 N.Y.2d at 385, n. *, 482 N.Y.S.2d at 460 , n. *.

In this case, the evidence adduced by plaintiffs may be sufficient to raise a jury question as to whether the photograph of Spiegel's torso constitutes a "recognizable likeness." Plaintiffs have submitted an affidavit in which Spiegel implies that he recognized his torso in an advertisement promoting defendants' "Evolve" nutrition program and that Gravina, Schatzberg and other people in the Tiger Schulmann Karate organization told him that they recognized him and "mocked [him] because of it." Spiegel Aff. at ¶ 2. Although Spiegel's testimony that other people recognized him may be inadmissible hearsay, his testimony concerning their mocking

comments may be sufficient to prove circumstantially that they recognized him. Moreover, Spiegel's testimony that he recognized himself may, standing alone, be sufficient to establish that the image was recognizable as Spiegel. *See Cohen*, 63 N.Y.2d at 385, n. *, 482 N.Y.S.2d at 460, n. *.

However, the evidence introduced by plaintiffs is not sufficient to create a genuine issue of fact concerning the scope of the consent. As the New York Court of Appeals has repeatedly noted, "a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him." *Dzurenko v. Jordache, Inc.*, 59 N.Y.2d 788, 790, 464 N.Y.S.2d 730, 731 (1983) (quoting *Shields v. Gross*, 58 N.Y.2d 338, 347, 461 N.Y.S.2d 254, 258 (1983)). Therefore, if there is a "limitation in the consent . . . as to time, form or forum, the use of a name, portrait or picture is without consent if it exceeds the limitation." *Id.*

The three cases cited in plaintiffs' responsive papers are all cases in which some sort of limitation existed in the consent. In *Manger v. Kree Inst. of Electrolysis, Inc.*, 233 F.2d 5 (2d Cir. 1956), for example, the plaintiff agreed in writing to have a specific letter and her photograph published in the defendant's magazine. The defendant thereafter changed the letter without the plaintiff's permission. The Second Circuit found that the change was "so substantial as to vitiate her written consent," and therefore found that the trial court had correctly allowed the plaintiff's § 51 claim to go to the jury. *Id.* at 8.

In *Russell v. Marboro Books*, 18 Misc.2d 166, 183 N.Y.S.2d 8 (Sup. Ct. N.Y. County 1959), a professional photographer's model signed a release consenting to the unrestricted use of a particular photograph. The defendant thereafter used an altered version of the photograph in an objectionable advertisement. The court noted that this photo, if "altered sufficiently in situation,

emphasis, background or context, . . . would no longer be the same portrait, but a different one." *Id.*, 18 Misc.2d at 182, 183 N.Y.S.2d at 27.  The court thus held that "although the plaintiff consented in writing to the use of her portrait for advertising purposes . . . , it does not follow that the consent signed by the plaintiff goes beyond its wording so as to exculpate, as a matter of law, the dissemination of all types of altered pictures . . . ."  *Id.*, 18 Misc.2d at 182, 183 N.Y.S.2d at 27-28.

Similarly, in *Carlson v. Hillman Periodicals, Inc.*, 3 A.D.2d 987, 163 N.Y.S.2d 21 (App. Div. 1st Dep't 1957), a model executed a consent which gave the defendant "the right to publish a photograph of the plaintiff in a manner which is 'composite or distorted in character, or form.'" *Id.*, 3 A.D.2d at 987, 163 N.Y.S.2d at 21.  Thereafter, the defendant had the photograph retouched to remove the plaintiff's hair.  The court could not determine from the consent itself whether the parties intended to permit the defendant to use the photograph in that manner, and therefore held that testimony could be introduced to aid in construction of the written consent.

In this case, plaintiffs concede that Spiegel signed a "general release" at the time he began participating in a weight-loss program.  Plaintiffs' Memo at 22.  Plaintiffs allege that Spiegel understood that his photograph would be used to show his torso before entry into the program, and that he neither agreed to alteration of the photograph nor anticipated that it would be used in any other way.  *Id.*  However, the release which Spiegel signed contained no such limitations.  Rather, the consent signed by Spiegel provides:

> That he . . . may be photographed, cast, involved and/or portrayed in what is defined below as Promotional Material, to be broadcast and/or otherwise disseminated into the public domain by TSK. The undersigned hereby agrees and consents for all purposes, to the sale, reproduction and/or *use in any manner* of any and all photographs, videos, films, audio, or any depiction or portrayal of the undersigned or his . . . likeness and/or voice whatsoever, with or without the use of the undersigned's name (hereinafter,

"Promotional Material") by TSK and by any nominee or designee
of TSK, including without limitation, any agency, client, periodical
or other publication, in all forms of media and in all manners,
including without limitation advertising, trade, display, editorial,
art and exhibition.

Defendants' Memo, Ex. M (emphasis added).

Unlike the releases in *Manger*, *Russell* and *Carlson*, this release does not relate to a

single photograph or document, much less contain any language limiting the use of that

photograph or document. To the contrary, the release expressly provides that Spiegel may be

"photographed," and that any photographs taken of Spiegel may be used "in any manner." Since

there is no question as to very broad scope of Spiegel's written consent, there is no genuine issue

of material fact to be determined by a jury. Spiegel is not entitled to relief under New York Civil

Rights Law § 51, and defendants' motion for summary judgment with respect to Count IV is,

therefore, granted.

Counts V, VI, and IX

Plaintiffs' fifth and sixth causes of action both allege retaliation in violation of 42 U.S.C.

§ 12203. This section of the ADA provides, *inter alia*, that "[n]o person shall discriminate

against any individual because such individual has opposed any act or practice made unlawful by

this chapter or because such individual made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Plaintiffs allege that defendants violated this section by (1) filing a frivolous lawsuit against

Spiegel in Connecticut state court (Count V) and (2) refusing to pay Spiegel's "qualifying

medical expenses" (Count VI).

Claims of retaliation under the ADA are analyzed using the same *McDonnell Douglas*

burden-shifting framework discussed above. *See*, *e.g.*, *Treglia v. Town of Manlius*, 313 F.3d

713, 719 (2d Cir. 2002). Under that framework, a plaintiff has the initial burden of establishing a *prima facie* case of retaliation by showing (1) that the plaintiff engaged in a activity protected by the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse employment action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. *See id.* A plaintiff's burden at this *prima facie* stage is *de minimis*. *Id.*

In this case, defendants raise two arguments suggesting that plaintiffs have not met their initial burden because they have not proved the third of the four elements listed above. First, defendants argue, under the broad heading that "the entire complaint must be dismissed as it fails to state a prima facie case for liability against the defendants," that Spiegel has never been employed by either defendant. Defendants' Memo at 3-4. Second, defendants argue that they are not parties to the Connecticut lawsuit, which was brought in the name of Stamford Karate, Inc., and that they, therefore, did not take any adverse action against Spiegel. Defendants' Memo at 10-11. Plaintiffs respond by arguing, *inter alia*, (1) that a lawsuit can be an adverse employment action for purposes of the ADA and (2) that defendants may be held liable because they caused the lawsuit to be brought against Spiegel. Plaintiffs' Memo at 17-18.

Preliminarily, this Court notes that even if Spiegel were bringing these ADA retaliation claims against his employer, plaintiffs might not be able meet the burden of showing a *prima facie* case as to Count V. Plaintiffs do not cite, and this Court's independent research has not found, any Second Circuit caselaw to support the proposition that an employer's lawsuit against a former employee can constitute an "adverse employment action." While plaintiffs have cited to cases from other circuits for this proposition – *e.g.*, *Ward v. Wal-Mart Stores, Inc.*, 140 F. Supp. 2d 1220 (D.N.M. 2001); *E.E.O.C. v. Levi Strauss & Co.*, 515 F. Supp. 640 (N.D.Ill 1981);

and *E.E.O.C. v. Virginia Carolina Veneer Corp.*, 495 F. Supp. 775 (W.D. Va. 1980) – they fail to note that there are also courts which have declined to hold that a post-termination lawsuit can be an adverse employment action. *See, e.g.*, *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528 (5th Cir.), *cert. denied*, 540 U.S. 817 (2003) (holding that an employer's counterclaim against the plaintiff was not actionable retaliation under Title VII or the ADEA).

Although there is a substantial question as to whether the rationale underlying *Hernandez* and other, similar cases is still valid in the wake of the Supreme Court's recent decision in *Burlington Northern & Santa Fe Ry. Co. v. White*, ___U.S.___, 126 S.Ct. 2405 (2006),[8] this Court need not address this conflict or predict what position the Second Circuit would take. Even assuming that plaintiffs could establish that an *employer's* post-termination, frivolous lawsuit could constitute an "adverse employment action," plaintiffs have not cited any persuasive caselaw, or advanced any theory, in support of the proposition that individuals – much less individuals who are not the employer – can be liable under the ADA for retaliatory lawsuits. The only case cited by plaintiffs in support of this proposition – *Martinez v. Deaf County Grain Processors, Inc.*, 583 F. Supp. 1200 (N.D. Tex. 1984) – did not involve Title VII or ADA retaliation claims, but involved allegations that a corporation had filed a lawsuit against

_____

[8]The decision in *Hernandez* was based on the Fifth Circuit's very narrow definition of "adverse employment action," which required plaintiffs to show that their employer subjected them to an "ultimate employment decision." *See Hernandez*, 321 F.3d at 531. Under that standard, actionable retaliatory conduct was limited to acts "such as hiring, granting leave, discharging, promoting, and compensating." *White*, 126 S.Ct. at 2410 (quoting *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997)). However, the Supreme Court's June 2006 opinion in *White* abrogated *Mattern* and similar cases, holding that retaliation claims were not limited to acts affecting employment or altering the conditions of employment. *Id.* at 2412. It is, therefore, unclear whether the Fifth Circuit would adhere to its holding in *Hernandez*, or join those courts which have defined "adverse employment action" more broadly and have held that a frivolous post-termination lawsuit can constitute such action. *See, e.g.*, *Berry v. Stinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who had complained about discrimination).

a farm worker to retaliate for the worker's having filed an action pursuant to the Fair Labor Standards Act ("FLSA") and the Farm Labor Contractor Registration Act ("FLCRA"). Although the farm worker had been hired by one Skiles, the principal owner, manager and supervisor of the corporation, the court found, "based on the totality of the circumstances and the economic realities of [the] Plaintiff's employment," that the corporation was the plaintiff's "employer." *Id.* at 1203. The *Martinez* court then reasoned, based in part on *Levi Strauss* and *Virginia Carolina Veneer*, that the corporation's lawsuit could constitute retaliation under the FLSA and FLCRA. *Id.* at 1208-09.

In this case, plaintiffs assert that Schulmann, a principal of Stamford Karate, approved Hunko's decision to hire Spiegel. Even assuming that Schulmann did so, however, there is nothing to suggest that Spiegel ever became Schulmann's employee, rather than an employee of Stamford Karate. The *Martinez* opinion, which did not explore the question of whether Skiles could be held personally liable for his corporation's actions, does not suggest any theory for holding Schulmann personally liable for Stamford Karate's lawsuit.

*Martinez* is also distinguishable in that it involved allegations of retaliation under the FLSA and FLCRA, not Title VII or the ADA. "It is well settled that an individual may not be held personally liable under the ADA," even on retaliation claims. *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 295 (S.D.N.Y. 2004). Thus, even if *Martinez* had held that Skiles could be liable for retaliation in connection with his corporation's lawsuit, this would not support the proposition that Schulmann could be individually liable under the ADA for similar acts.

Although this Court has previously held that Schulmann is the only defendant over which it has personal jurisdiction, the Court notes that plaintiffs have adduced no evidence that UAK

was involved in the decision to file the Connecticut lawsuit. This lawsuit was unquestionably brought in the name of Stamford Karate, Inc., *see* Defendants' Memo, Ex. N, and plaintiffs have not introduced any evidence to suggest that UAK directed the filing of the lawsuit. Indeed, plaintiffs' own theory is that the Connecticut lawsuit "was in fact instigated by Schulmann." Plaintiffs' Memo at 19.

Similarly, with respect to Count VI – alleging that defendants retaliated against Spiegel in violation of the ADA by denying his medical claims – plaintiffs have not introduced any evidence to suggest that defendants were in any way involved in the alleged retaliation. Defendants have produced evidence that all decisions regarding payment of Spiegel's medical claims were made by a health insurance carrier – not defendants – and that Spiegel was not paid upon the disputed claims because he had not yet met the $500 deductible. Affidavit of Penelope Kousis dated Sept. 8, 2005 (Ex. O to the Defendants' Memo) at ¶¶ 3-4. Although plaintiffs' pleadings allege that UAK pays some medical claims itself, *see*, *e.g.*, Second Am. Complt. at ¶ 85, and implies that the unpaid medical claims were among those for which UAK was self-insured, *id.* at ¶ 90, plaintiffs have not introduced any evidence to substantiate these allegations.

Plaintiffs' ninth cause of action, which alleges that defendants violated ERISA and COBRA, are based on the same factual allegations which underlie Count VI. Accordingly, defendants are awarded summary judgment with respect to Count IX, as well as Counts V and VI.

<u>Counts VII and VIII</u>

Plaintiffs' two remaining causes of action allege that defendants retaliated against plaintiffs in violation of the NYSHRL and NYCHRL by, among other things, filing the Connecticut lawsuit against Spiegel. Under 28 U.S.C. § 1367(c), this Court may decline to exercise supplemental jurisdiction over these claims if (1) they raise "a novel or complex issue

of State law," (2) these claims "substantially predominate[] over the claim or claims over which the district court has original jurisdiction," (3) this Court "has dismissed all claims over which it has original jurisdiction," or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." As discussed below, claims included within Counts VII and VIII fit within at least two, and possibly three, of these subsections. Accordingly, this Court declines to exercise pendant jurisdiction over them.

First, these counts appear to raise an issue of first impression: whether defendants' allegedly frivolous Connecticut lawsuit against Spiegel can serve as a basis for a retaliation claim under either the NYSHRL and NYCHRL. Plaintiffs have not cited, and this Court's independent research has not found, any New York State cases addressing this issue. This issue is not only novel, but unquestionably complex. For this reason alone, it is appropriate that this Court not exercise supplemental jurisdiction over Counts VII and VIII. *See* 28 U.S.C. § 1367(c)(1).

Second, this Court has granted defendants' motion for summary judgment with respect to all federal claims. In deciding whether to exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state law claims, this Court must "consider and weigh . . . the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "When the balance of these factors indicates that a case properly belongs in state court, . . . the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* However, the Second Circuit "has held, as a general proposition, that if [all] federal claims are dismissed before trial . . . , the state claims should be dismissed as well." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir.

38

2004), *cert. denied*, 544 U.S. 1044 (2005) (internal quotations and emphasis omitted).

Since all federal claims in this case have now been dismissed, this Court deems it appropriate to decline to exercise supplemental jurisdiction. In so doing, this Court is cognizant that "when the dismissal of the federal claim[s] occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair." *Id.*, 388 F.3d at 56 (internal quotations omitted; bracketed material added). However, the rejection of supplemental jurisdiction at this juncture is not belated. Although Judge Ross decided a motion to dismiss counts of the original complaint, Counts VII and VIII first appeared in the Second Amended Complaint, which was filed after Judge Ross decided the motion to dismiss. Accordingly, this Court has not had a previous opportunity to consider whether to exercise supplemental jurisdiction over these two causes of action.

Moreover, rejection of supplemental jurisdiction in this case is not only fair, but necessary. These two claims present exceptional circumstances which compel the decision to decline to exercise jurisdiction. In asserting that the Connecticut lawsuit was retaliatory, both claims implicitly assert that the state action was frivolous and brought solely to retaliate against Spiegel for pursuing his employment discrimination claims. Assuming, *arguendo*, that these facts even state a retaliation claim under the NYSHRL or NYCHRL, determination of the claims will necessarily require a determination of the merits of the Connecticut action. That determination could be inconsistent with, and undercut, the determination of the state court addressing the very same issue. Accordingly, this Court, in its discretion, elects not to exercise discretion over Counts VII and VIII.

Plaintiffs' Motion to Further Amend their Pleadings

At the same time defendants filed the above-discussed motion for summary judgment, plaintiffs filed a cross-motion pursuant to Fed. R. Civ. P. 15(a) and 20 to further amend their complaint in order to add a new defendant, TSK Franchise Systems, Inc. ("TSK"). In their memorandum of law in support of this motion, plaintiffs assert that "UAK was in effect replaced" by TSK in 2002, after the New York State Attorney General brought suit against UAK for "operating franchises illegally." Plaintiffs' Memorandum of Law in Support of Motion for Leave to Amend at 1. Although plaintiffs assert that they did not learn that TSK had replaced UAK until "the last day of discovery," *id.* at 2, plaintiffs do not seek to conduct further discovery with respect to TSK. To the contrary, plaintiffs represent that TSK's liability "stem[s] directly from the same findings of law and fact regarding the alleged discriminatory actions required to impose liability on the current Defendants," and that "[p]laintiffs are asserting no claims against TSK that have not already been asserted against . . . UAK." *Id.* at 5. True to these representations, plaintiffs' proposed Third Amended Complaint (Ex. A to the Declaration of Eric J. Grannis in Support of Plaintiffs' Motion for Leave to Amend or Join an Additional Defendant) adds virtually no new factual allegations, aside from a paragraph making the same jurisdictional allegations with respect to TSK as are made with respect to UAK. *See* Proposed Third Am. Complt. at ¶ 7.

Although Rule 15(a) specifically provides that "leave shall be freely given when justice so requires," district courts have discretion to deny leave "where amendment would be futile." *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) (citing *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91-92 (2d Cir. 2003)). Since plaintiffs contend that TSK has effectively replaced UAK, it would obviously be futile for this Court to grant leave to amend the

pleading after granting defendants' motion for summary judgment as to all claims against UAK.

Accordingly, plaintiffs' motion for leave to further amended their pleadings is denied.

CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted

with respect to Counts I, II, III, IV, V, VI and IX of the Second Amended Complaint.  This Court

declines to exercise supplemental jurisdiction with respect to Counts VII and VIII and, therefore,

these two counts are dismissed without prejudice to raising these claims in state court.  *See* 28

U.S.C. § 1367(c).[9]  Plaintiffs' cross-motion to further amend their pleadings in order to add a

new defendant is denied.  The Clerk of Court is directed to enter judgment in accordance with

this Memorandum and Order and to close this case.

**SO ORDERED.**


_____/s/_____
SANDRA L. TOWNES
United States District Judge


Dated: Brooklyn, New York
       November 30, 2006

---

[9]By operation of 28 U.S.C. § 1367(d), the period of limitations for these claims has been tolled during the pendency of this action, and shall be tolled for at least 30 days from the date of this Memorandum and Order.